**Dated: January 16, 2026**

**The following is ORDERED:**



Janice D. Loyd
U.S. Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Bradley Rund and Jennifer Rund, | ) | |
| | ) | Case No. 24-13385-JDL |
| Debtors. | ) | Chapter 7 |
| | ) | |
| Legacy Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 25-1019-JDL |
| | ) | |
| Bradley Rund and Jennifer Rund, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER DETERMINING DEBT NON-DISCHARGEABLE**
**IN PART AND DISCHARGEABLE IN PART**

### I. Introduction

This adversary proceeding is before the Court for decision after a trial conducted on October 28, 2025. Plaintiff, Legacy Bank (the "Bank"), commenced this adversary proceeding seeking to have the debt owed it by Defendants/Debtors Bradley Rund and Jennifer Rund (collectively referred to as the "Debtors" or individually as "Bradley" and

"Jennifer") determined non-dischargeable under 11 U.S.C. § 523(a)(2)(B).[1] The issue before the Court is whether the Debtors, or either of them, submitted materially false written statements respecting their financial condition upon which the Bank reasonably relied in making the loans so as to render the Debtors' debt to the Bank non-dischargeable under § 523(a)(2)(B).

After considering the documentary and testimonial evidence, weighing the credibility of the witnesses and considering the written closing arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2] For the reasons set forth herein, the Court finds that the Bank has met its burden of proof under § 523(a)(2)(B) that the debt hereinafter referred to as Loan # 1 owed it by Defendant Bradley is non-dischargeable. The Court finds that Debtors' debt to the Bank hereinafter referred to as Loan # 2 is discharged.

## II. Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157 (a) and the Order of Reference of the United States District Court for the Western District of Oklahoma as Local Rule LCvR 81.4(a). Furthermore, pursuant to Rules 7008 and 7012(b), the Bank and the Debtors have consented to entry of final orders or judgment by the bankruptcy court. This adversary proceeding brought pursuant Rule 7001(f) (a

---

[1] All further references to "Code", "Section", and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

[2] All future references to "Bankruptcy Rule", "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.

2

proceeding to determine whether a debt is dischargeable) is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I) (a determination as to the dischargeability of particular debts).

### III. Factual Findings[3]

1. Plaintiff Bank is an Oklahoma state-chartered banking corporation.

2. Defendants are debtors who filed a voluntary joint petition under Chapter 7 of the Bankruptcy Code (Case No. 24-13385-JDL) in the Western District of Oklahoma on November 27, 2024.

3. The Oklahoma Tax Commission ("OTC") filed Tax Warrant Number ITI2007503550-00 in Oklahoma County on April 26, 2007, against Defendants Bradley and Jennifer Rund in the amount of $11,483.93 for failure to pay taxes in 2004 and 2005.

4. Ford Motor Credit Corporation ("FMCC") obtained a judgment against Defendant Bradley Rund in Case No. CS-2010-11-49 in Oklahoma County on May 5, 2010 (the "FM CC judgment"), in the amount of $9,595.70, and issued garnishments in 2010, 2011, 2012, 2014, 2015, 2018, 2019, 2020.

5. FMCC renewed its judgment against Defendant Bradley Rund on October 17, 2014, November 16, 2018, and March 21, 2023.

6. The OTC filed Tax Warrant Number ITI2013002036-00 in Oklahoma County on April 29, 2013, against Defendants Bradley and Jennifer Rund in the amount of $5,838.68 for failure to pay taxes in 2007 and 2009-2011.

---

[3] The first eighteen (18) numerical paragraphs are the Stipulated Facts contained in the *Final Pretrial Order* [Adv. Doc. 21] which, by agreement of the parties, were read into the record by the Court at the commencement of the trial. [Tr. pgs. 7-10]. Some of the wording of the Stipulated Facts as set forth in this Opinion and Order have been modified for clarity. No substantive changes have been made.

7. Defendant Bradley Rund filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code (Case No. 15-12507) on July 2, 2015, listing the FMCC judgment ($10,203.97) and the OTC debt ($31,302.01) in the Schedules. This Court entered an Order Denying Confirmation and Dismissing Case on October 16, 2015.

8. Defendant Bradley Rund filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code (Case No. 16-10205) on January 26, 2016, listing the FMCC judgment ($10,203.97) and the OTC debt ($27,635.72) in the Schedules. This Court entered an Order Denying Confirmation and Dismissing Case on May 11, 2016.

9. The OTC filed Tax Warrant Number 1214554112 in Oklahoma County on November 21, 2016, against Defendants Bradley and Jennifer Rund in the amount of $1,505.25 for failure to pay taxes for 2012-2014.

10. The OTC issued garnishments against Defendants Bradley and Jennifer Rund in Case No. CJ-2017-2280 in Oklahoma County in 2017, 2021, 2022, and 2023.

11. On January 12, 2022, Defendant Bradley Rund submitted a Uniform Residential Loan Application ("Credit Application") to the Bank for a home construction loan. The Credit Application did not show any judgments against him under the "Liabilities" sections of the Credit Application. There was no disclosure of the FMCC judgment or the OTC debt. Rund stated in the Credit Application that his only liabilities were four credit cards with $0 balances.

12. On March 9, 2022, Bradley Rund executed a Promissory Note in favor of the Bank in the principal amount of $410,968.10 ("Loan # 1").

13. On January 23, 2023, Bradley and Jennifer Rund signed and submitted an

Credit Application to the Bank for another loan ("Loan # 2").[4] The FMCC and OTC debts were not disclosed in the Credit Application.

14. Defendants Bradley and Jennifer Rund are co-makers of a $172,547.57 promissory note ("Loan # 2") in favor of Plaintiff, Bank dated January 23, 2023.

15. Defendant Bradley Rund defaulted on Loan # 1 for nonpayment as of August 8, 2023, and at the time of filing for bankruptcy on November 27, 2024, the remaining balance due and owing was $470,858.23.

16. Defendants Bradley and Jennifer Rund defaulted on Loan # 2 for nonpayment as of May 23, 2023, and at the time of filing for bankruptcy on November 27, 2024, the remaining balance due and owing was $226,545.37.

17. Defendants Bradley and Jennifer Rund listed the FMCC judgment in the amount of $11,309.21 in their Schedule E/F of their bankruptcy petition filed in Case No. 24-13385 filed on November 27, 2024, and in their Amended Schedules filed on January 3, 2025.

18. Defendants Bradley and Jennifer Rund listed the OTC debts in the amounts of $26,980.43 and $14,076.02 in their Schedule E/F of their bankruptcy petition in Case No. 24-13385 filed on November 27, 2024, and in their Amended Schedules filed on January 3, 2025.

19. On January 20, 2022, the Bank obtained a Credit Report for Bradley Rund from TransUnion. The Credit Report reflected a FICO credit score of 664; a Chapter 13 bankruptcy filed on 7/02/2015; a Chapter 13 Bankruptcy filed on 1/26/2016; three credit cards which had a history of "past due" or "charged off" prior to 2020; and nine credit cards

---

[4] The actual credit application date is Jan. 18, 2023. [Bank Ex. 10].

5

with an account rating of 01 ("paid or paying as agreed"), with all four active credit card accounts having an account rating of 01. The Credit Report did not reflect any debt to FMCC or the OTC. [Bank Ex. 22].

20. A Credit Memorandum prepared by the Bank dated January 20, 2022, under "Policy Review," reflected (1) "prior bankruptcy" with no "mitigation required" for the reason that "Re–Established credit since Bankruptcy," (2) "Tradeline(s) over 90 days up to charge off found" but no "mitigation required" because "Re-Established credit since Bankruptcy" and (3) "Prior Derogatory Public Record(s)" but no "mitigation required" because "Re-Established credit since Bankruptcy." [Bank Ex. 23].

21. On December 27, 2022, prior to Loan # 2, the Bank obtained a credit report from Factual Data. [Bank Ex. 24]. In this Credit Report, Bradley had a FICO score of 585 and Jennifer 599 and indicating "serious delinquency" for both. Per this credit report, Bradley's and Jennifer's credit scores had changed considerably since the one obtained in conjunction with Loan # 1. [Tr. pg. 176]. Part of the Factual Data credit report was a Lexis Nexis-Risk Solutions Liens and Judgments Report for Bradley and Jennifer Rund. The Report indicated "No records available."

22. In conjunction with Loan # 1, the Bank requested, and Bradley Rund produced, his Earnings Statements from his employer, Sun West Mortgage, for the period of November 1- December 31, 2021, and his IRS Forms W-2 for 2020 and 2021 and 2021 W-2 & Earnings Summary from employer Member First Mortgage, LLC.

23. In conjunction with Loan # 2, the Bank requested, and Bradley Rund produced, his Earnings Statements from Sun West Mortgage for the period of September 1 - 30,

2022 and his 2022 W-2 from Sun West Mortgage and his 2022 W-2 from Custer County.

## IV. Discussion

### A. Exceptions to Discharge-General Considerations

The "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991). In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor. *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Kukuk v. Chevy Chase Bank, FSB (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998).

### B. Elements of a § 523(a)(2)(B) Cause of Action

To sustain an objection to the dischargeability of a debt under § 523(a)(2)(B), a creditor must establish the following elements by a preponderance of the evidence:

> (1) The debtor used a statement in writing.
>
> (2) The statement was materially false.
>
> (3) The statement concerned the debtor's or an insider's financial condition.
>
> (4) The creditor reasonably relied on the statement; and
>
> (5) The debtor made or published the statement with the intent to deceive the creditor.

*In re Cribbs,* 327 B.R. 668, 673 (10th Cir. BAP 2005); *In re Turner,* 358 B.R. 422, 425 (Bankr. N.D. Okla. 2006). Each of these elements must be proven by a preponderance of the evidence for the debt to be deemed nondischargeable. *Grogan v. Gardner*, 498 U.S.

279, 291,111 S.Ct. 654 (1991). "This means that the trier of fact must believe the existence of a fact is more probable than its nonexistence." *Northland National Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 812 (8th Cir. BAP 2011). The Court will apply these elements to Loan # 1 made in March 2022 and Loan # 2 made in January 2023.

As established by the *Final Pretrial Order* and read into the record at trial, there is no dispute that two of the five elements to establish a § 523(a)(2)(B) claim are present: (1) that the Debtor(s) used a statement in writing and (2) the statement concerned their financial condition.[5] Here, the Credit Applications presented to the Bank with regard to Loan # 1 made in March 2022 and Loan # 2 made in January 2023 were produced and signed by the Debtors, Bradley in 2022 and Bradley and Jennifer in 2023. The dispute exists as to the remaining three elements: were the financial statements materially false; did the Bank reasonably rely upon the statements in making the loans; and did the Debtors publish the financial statements with the intent to deceive the Bank. With the foregoing standards in mind, the Court will measure the facts of this case as previously outlined against the legal elements that the plaintiff must establish to support a finding of nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code.

---

[5] The Uniform Residential Loan Application ("Credit Application") dated January 12, 2022, for Loan # 1 admitted at trial is an unsigned copy. [Bank Ex. 9]. For § 523(a)(2)(B) to apply, the statement at issue must be either "written by the debtor, signed by the debtor, written by someone else but adapted and used by the debtor." *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997) (citing 4 *Collier on Bankruptcy* ¶ 523.08[2][a] (15th ed. 1997) (emphasis omitted)); *Itria Ventures LLC, v. Chadha (In re Chadha),* 598 B.R. 710, 718 (Bankr. E.D. N.Y. 2019) (concluding that a writing need not be completed entirely by the debtor, instead, "[i]t is sufficient that [a] [d]ebtor[ ] either wrote, signed, or adopted such statement to find that the documents were 'written' by them.") (quoting *In re Cedillo*, 573 B.R. 405, 421 (Bankr. E.D. N.Y. 2017)) (alternation in original). It is not disputed that the Credit Application was completed and submitted by Bradley in conjunction with Loan # 1.

8

### 1. Were the Financial Statements "Materially False"

There is more than one way for a creditor to prove that a statement is materially false for purposes of § 523(a)(2)(B). If the statement "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit," then it is materially false. *Webster Bank, National Association v. Contos (In re Contos)*, 417 B.R. 557, 564 (Bankr. N.D. Ill. 2009). Alternatively, a statement is materially false if the creditor would not have extended credit had it been aware of the misrepresentation. *See e.g. In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).

In other words, a statement is materially false if it "paints a substantially untruthful picture of an entity's financial condition that objectively would, and subjectively did, affect a creditor's decision to pay money to a debtor." *In re May*, 579 B.R. 568, 583 (Bankr. D. Utah 2017) (quoting *JD Investments of Utah, LLC v. Hansen (In re Hansen)*, 2014 WL 2548100, at *6 (Bankr. D. Utah 2014) (collecting cases).) "A statement may be rendered materially false either by an affirmative misrepresentation, or by omission." *Privitera v. Curran (In re Curran)*, 855 F.3d 19, 25 (1st Cir. 2017) (citations omitted); *In re Bundy*, 95 B.R. 1004, 1008 (Bankr. W.D. Mo. 1989). But in order for an omission to be actionable under § 523(a)(2)(B), "the party privy to the omitted information must have been obligated to furnish it." *Privitera v. Curran*, 855 F.3d at 25-26.

"The materiality of the omission [of a debt] is often attempted to be shown by the testimony of the lending officer that if he or she had known of the existence of the omitted debt, he would have refused to make the loan." *Bogstad*, 779 F.2d at 375 (citing 1 D.

Cowans, Bankruptcy and Law Practice 343 (1978)). As will be discussed in more detail below, both Bank officials testified that they would not have made Loan # 1 or Loan # 2 had they been aware that Bradley had a judgment against him for which garnishments were being issued. They also testified that the Bank would not have made the loans had they known that Bradley and Jennifer had outstanding tax liabilities to the State of Oklahoma for approximately $30,000.

### 2. Did the Bank Reasonably Rely Upon the Statements

The next element of the Bank must prove is that it reasonably relied on the Debtor's financial statements (Credit Applications). Under § 523(a)(2)(B), "reasonable reliance" by a creditor on a financial statement requires that the creditor's reliance on the debtor's materially false written statement be objectively reasonable under the totality of the circumstances. *In re McCarthy,* 421 B.R. 550, 561-62 (Bankr. D. Colo. 2009) "Reasonable reliance" is determined on a case-by-case basis, judged in light of the totality of the circumstances after an examination of all facts and circumstances. *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000). Whether reliance is reasonable is measured by an objective standard. *In re Turner,* 358 B.R. 422, 426 (Bankr. N.D. Okla. 2006) ("The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances."); *In re Robertson*, 570 B.R. 352, 362 (Bankr. D. Utah 2017) ("[T]his standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon [the] debtor's representations.") (citing *Leadership Bank, N.A. v. Watson (In re Watson)*, 958

10

F.2d 977, 978 (10th Cir. 1992)). "Reasonable reliance can be demonstrated by showing that credit would not have been extended had accurate information been provided." *Rosen's, Inc. v. Ghere (In re Ghere),* 393 B.R. 209, 217 (Bankr. W.D. Mo. 2008) (citing *Norbank v. Kroh (In re Kroh)*, 87 B.R. 1004, 1008 (Bankr. W.D. Mo. 1988)).

This objective standard is a more demanding standard than the subjective "justifiable reliance" standard found in § 523(a)(2)(A) concerning whether a creditor was misled by a debtor's verbal false pretenses, false representations or actual fraud. *See In re Glasgow*, 370 B.R. 362, 371-72 (Bankr. D. Co. 2007) (citing *Field v. Mans*, 516 U.S. 59, 76, 116 S.Ct. 437, 446 (1995)). While reasonable reliance judged on an objective standard may be more demanding than the subjective standard of justifiable reliance, a creditor's burden should not be an onerous one. *Veritex Community Bank v. Osborne (Matter of Osborne)*, 951 F.3d 691, 698 (5th Cir. 2020). The reasonableness requirement "is a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith." *National Union Fire Ins. Co. of Pittsburgh PA v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2nd Cir. 1996) (quoting *In re Shaheen*, 111 B.R. 48, 53 (S.D. N.Y. 1990)).

Not only does § 523(a)(2)(B) require reasonable reliance but "actual reliance;" however, a creditor need not exclusively rely on a false financial statement-partial reliance is sufficient. *In re Stum*, 2021 WL 5630342, at *7 (10th Cir. BAP 2021). The false financial statement need only be a "substantial factor in the creditor's decision." *In re Gerlach*,, 897 F.2d 1048, 1052 (10th Cir. 1990).

Courts generally apply three factors in assessing reasonable reliance: (1) whether there had been previous business dealings with the debtor that gave rise to a relationship

of trust between the creditor and debtor, (2) whether there were any "red flags" indicating inaccuracies, and (3) whether a minimal investigation would have revealed the inaccuracies. *Osborn*, 951 F.3d. at 698. A creditor's failure to conduct even minimal due diligence in the face of obvious discrepancies can render reliance unreasonable. *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 600 (Bankr. W.D. Tenn. 2001).

"[T]he concept of reasonable reliance does not generally require a creditor to conduct an investigation prior to entering into agreements with prospective debtors." *In re Gunsteen,* 487 B.R. 887, 902 (Bankr. N.D. Ill. 2013)**;** *In re Beach,* 651 B.R. 359, 375 (Bankr. E.D. Wisc. 2023)**;** *In re Cohn*, 54 F.3d 1108, 1117 (3ʳᵈ Cir.1995) (If the creditor follows its usual business practices, reliance is reasonable, absent other circumstances.); *In re Larrieu,* 230 B.R. 256, 266 (Bankr. E.D. Pa. 1999) ("lenders are not required to investigate every detailed information provided by the borrowers"); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 676 (7ᵗʰ Cir. 1995) ("A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to...be blocked by a discharge under the bankruptcy laws–just because he did not conduct a more thorough investigation."). However, a creditor "cannot close his eyes to a known risk." *Id.* "If the [creditor] possesses information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie." *Id.*

While the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors, such a precaution could be the ordinarily prudent choice in circumstances where the creditor admits that it does not believe the representations made by the prospective debtor. *In re*

*Morris*, 223 F.3d 548, 554 (7th Cir. 2000); *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993). In short, **"**[t]he reasonable reliance requirement must not become a vehicle by which the courts, having the benefit of 20/20 hindsight, second guess a creditor's loan policies or the wisdom of its lending decisions." *In re Reeds*, 145 B.R. 703, 707 (Bankr. N.D. Okla. 1992) (quoting *In re Schoeff*, 116 B.R. 119, 122 (Bankr. N.D. Ind.1990))**.**

Matthew Tyson (Tyson), an 18 year employee of the Bank, and currently the Bank's Vice President of Loan Processing, testified that he was the chief of the Bank's Underwriting Department when the Bank made both Loan # 1 and Loan # 2 to the Debtors. The Underwriting Department is responsible for determining whether a consumer loan, consumer real estate applications and consumer construction loans should be approved. Tyson testified that in determining whether a loan should be approved the Bank examines the potential borrowers credit history to see if he/she has repaid their debts, looking at income information to determine whether they would be able to service the payments, looking at the collateral, the budget, plans and specifications of the project to make sure if the loan can be performed. This evaluation includes obtaining a credit report, receiving financial information including tax returns, W-2s, pay stubs, bank statements, the applicant's assets and liabilities. [Tr. pgs. 151-153].[6] The evidence was that the Bank followed its normal practice of conducting due diligence with regard to the Debtors.

Tyson reviewed Bradley's Credit Application of January 12, 2022, which in ¶ 2(c)

---

[6] The testimony of Andy McPherson ("McPherson"), Senior Vice President of Legacy Bank and loan officer, was consistent with Tyson as to the documents used to evaluate a credit application. [Tr. pgs. 125-126].

titled "Liabilities-Credit Cards, Other Debts, and Leases that you Owe" showed four miscellaneous revolving credit cards with no balances. [Bank Ex. 9]. No other liabilities or expenses were listed in this credit report. [Bank Ex. 9, ¶ 2(d), indicating this section does not apply].

The TransUnion Credit Report verified that all active credit card accounts were being paid "as agreed."[7]  In the "Declarations" section of the Credit Application, Bradley had checked the boxes "no" in response to the questions whether he had ever filed bankruptcy and whether he had any outstanding judgments against him. [Bank Ex. 9, Section 5b.(G) and (M)]. Those representations by Bradley were false. The Credit Report did not show outstanding judgments, but it did reflect that Bradley had filed two previous bankruptcies in 2015 and 2016. Tyson testified that while bankruptcies could be considered "red flags," Bradley's bankruptcies did not pose a problem to making the loan because they were dismissed without a discharge of debts being granted and Bradley had apparently re-established good credit in the six to seven years following the bankruptcies. [Tr. pgs. 161&163].

Tyson testified that the Bank adhered to its standard lending practices in making Loan # 1. He testified that the Bank relied upon the information that Bradley had submitted

---

[7] There was no evidence or testimony produced as to why the FMCC delinquency and subsequent judgment was not on the TransUnion Credit Report. It is possible, but only speculation on the part of the Court, that the FMCC debt was not reported since it was probably first reported prior to 2010. The Fair Credit Reporting Act prohibits credit reports from disclosing debts more than seven years old. Title 15 U.S.C. § 1681c. Specifically, § 1681c(a)(4) and § 1681c(a)(5) address the prohibition on reporting accounts placed for collection, charged to profit and loss, or other adverse items of information that antedate the report by more than seven years, except for records of convictions of crimes. The TransUnion Credit Report did report the earlier bankruptcies because the Fair Credit Reporting Act permits the reporting agency to include bankruptcy cases filed within ten years of the credit report. 15 U.S.C. § 1681c(1). Consistent with the Fair Credit Reporting Act, the TransUnion Credit Report did not include a bankruptcy filed by Bradley in 2006.

in the credit application and the other financial documents which the Bank requested and that Bradley provided. [Tr. pg. 163]. The Bank was not aware of the FMCC judgment, renewals of the judgment and the garnishments. When asked if the Bank would have made Loan # 1 if it had known the facts related to the FMCC judgment, Tyson testified, "We would not have made the first loan." [Tr. pg. 164]. Tyson testified that the Bank was not aware of Bradley and Jennifer's debt to the OTC. When asked whether the Bank would have made Loan # 1 if it had known of unpaid taxes owed to the OTC for multiple years, 2004, 2005, 2007, 2009, 2010, 2011, 2012, 2014, 2015, totaling around $30,000, Tyson responded "absolutely not." [Tr. pg. 165].

The Debtors claim that the Bank did not reasonably rely upon the Debtors' financial statements because it did not undertake a sufficient due diligence investigation of checking the public record, including the Oklahoma Supreme Court Network (OSCN), which would have revealed the judgment in favor of FMCC, the suit by the OTC, and checking the filings in the office of the County Clerk of Oklahoma County which would have revealed the OTC liens. Debtors also assert that the Bank was deficient in its due diligence by failing to examine the Schedules in Bradley's bankruptcies in 2015 and 2016 which would have revealed the outstanding debts to FMCC and the OTC.

Bradley testified as to his experience as a mortgage broker in obtaining loans from financial institutions. Bradley compared his experience with loans that he was familiar with which adhered to Fannie Mae or Freddie Mac[8] guidelines and the way the Bank processed

---

[8] Fannie Mae and Freddie Mac are private companies operating under a congressional charter and supervised by the Federal Housing Finance Agency. Fannie Mae and Freddie Mac support the United States' mortgage market by purchasing loans from lenders, packaging them into mortgage-backed securities and selling them to investors.

15

his loan. In response to Bradley's testimony, Tyson testified that the Bank in making a home construction loan, which is generally one year in length, "doesn't necessarily adhere to the, standards of, let's say a 30 year fixed rate mortgage that's on the secondary market." [Tr. pg. 155]. Tyson testified that the Bank did not adhere to Fannie Mae or Freddie Mac guidelines because both loans were "short-term loans" and "we keep all our loans in-house... so they (the Bank's loan guidelines) did not apply to Fannie Mae or Freddie Mac. [Tr. pg. 168].

Bradley testified that in his experience the financial institution would obtain credit reports from all three major credit bureaus, not just TransUnion, and perhaps utilize a credit check search engine known as FraudGuard which pulls public records concerning a prospective borrower. Bradley testified that in his experience many borrowers don't know the answers to the questions on the credit application, so "we just, as an industry... say, "Hey, give us the basics... [and] we'll clean it all up for you.'" [Tr. pgs. 92-93]. Even if that were true, the Court cannot regard such a practice as an invitation for a debtor to conceal credit information which the lender affirmatively requested.

To the Court, Bradley's self-serving testimony as to what due diligence the Bank should have conducted rings hollow. Bradley testified that when he made his Credit Application for the Bank he "assumed they were going to do this type of due diligence" that he had seen in his background as a mortgage broker. [Tr. Pg. 93]. Bradley gave false information in his Credit Application. He now asks the Court to exculpate him from his wrongdoing by claiming that the Bank should have caught his lies before making the loans. As one court has put it, "[h]aving intentionally misled the sellers in an area he knew was important to them, it is unseemly for [the debtor] now to argue that he should be excused

16

from section 523 because the sellers believed him." *Matter of Osborne,* 951 F.3d 691, 698 (5th Cir. 2020) (quoting *In re Lansford*, 822 F.2d 902, 904 (9th Cir. 1987)). The evidence was clear that the Bank conducted due diligence in accordance with its normal procedures and those in the industry. In light of the evidence produced by the Bank as to what due diligence it conducted, the law does not permit this Court to second guess the reasonableness of the Bank's conduct in extending credit to Bradley under Loan # 1.

### 3. Did the Debtors Act With the Requisite Intent to Deceive the Bank

Under Bankruptcy Code § 523(a)(2)(B), the standard for determining a debtor's intent to deceive when submitting a false financial statement involves proving that the debtor acted with the intent to deceive, which can often be inferred from the totality of the circumstances or when other elements of § 523(a)(2)(B) have been met. *In re McCarthy,* 421 B.R. 550, 563 (Bankr. D. Colo. 2009); *Rural Enterprises of Oklahoma, Inc. v. Watson (In re Watson)*, 2003 WL 21241702, at *7 (10th Cir. BAP 2003). An intent to deceive does not mean that a debtor acted with a "malignant heart." *McCarthy,* 421 B.R. at 563-64. Rather, "a statement need only be made with reckless disregard for the truth to make the underlying debt nondischargeable under § 523(a)(2)(B)." *Central National Bank & Trust Co. of Enid, Oklahoma v. Liming (In re Liming),* 797 F.2d 895, 897 (10th Cir. 1986); *In re Weaver,* 579 B.R. 865, 891 (Bankr. D. Colo. 2018). For example, reckless disregard for the truth, combined with the magnitude of the misrepresentation, can support an inference of intent to deceive. *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison),* 555 F.3d 473, 482 (5th Cir. 2009). Similarly, intent to deceive can be inferred from the debtor's reckless indifference to the accuracy of the financial statement, particularly when the

totality of the circumstances supports such an inference. *Insurance Co. of North America v. Cohn (In re Cohn),* 54 F.3d 1108, 1119 (3rd Cir. 1995).

Additionally, courts may consider factors such as the debtor's sophistication in financial matters, whether there was a pattern of purposeful conduct, and whether the debtor knowingly omitted or misrepresented material facts in the financial statement. *SMGB, LLC v. Cross (In re Cross)*, 653 B.R. 362, 383 (Bankr. E.D. Texas 2023). In the present case, Bradley testfied he was employed as a "mortgage executive" and not "just a mortgage broker." [Tr. pg. 14]. He had been involved in the mortgage industry for more than 25 years. [Tr. pg. 13]. This degree of sophistication/employment is a factor in determining whether he acted with the requisite intent.

### A. Debtor Bradley Rund's Testimony

Bradley admitted that he didn't include the FMCC judgment, the OTC liens or prior bankruptcies on the Credit Application which he gave to the Bank. He testified that having a $30,000 tax debt to the OTC and $11,000 unpaid judgment by FMCC would not hurt his chances of getting a loan based on Fannie Mae/Freddie Mac guidelines. [Tr. pg. 86-87].[9] Bradley testified as to several reasons to justify why didn't he regard the FMCC and OTC obligations as "debts" to be disclosed in the Credit Application, none of which the Court deems credible. One reason was that in his prior experience in the mortgage industry "we

---

[9] Bradley testified that his credit applications to two other financial institutions, Blue Sky Bank and First Summit Bank, had been declined before he went to Legacy Bank. [Tr. Pg. 18]. There was no testimony why financing was declined. Bradley's TransUnion credit report provided to the Bank dated January 21, 2022, indicates that credit inquiries had been made in 2021 by Merrick Bank, CreditOne Bank and ML Tab Bank. [Bank Ex. 22]. The Court cannot speculate on the reasons for which his credit was declined at Blue Sky Bank and First Summit Bank, and what financial information was provided in the credit applications made to those institutions.

don't even ask our customers for any debt information ... we just have the customer fill out the basic stuff because we are going to pull all their information, the debts, the public records, and everything.... [s]o if something was overlooked, it was inadvertently." [Tr. pg. 39]. When Bradley gave his Credit Application to the Bank he "assumed" that the Bank was "going to do the type of due diligence" that he had seen other banks perform. [Tr. pg. 93]. Remarkably, it appears that Bradley was implying that lenders with whom he worked as a mortgage executive didn't rely upon the accuracy of credit applications or deem the information provided therein as important.

Bradley testified another reason was that while he agreed that unpaid back taxes are "[i]n some cases" liabilities, he didn't regard his OTC obligation as "debt" because he had "paid all the principal off on the Oklahoma Tax Commission... [and] I was getting ready to file an Offer and Compromise. ... [s]o I did not see those as an actual debt."[10] [Tr. pgs. 30 & 61]. He testified that he didn't list the FMCC judgment because he didn't know whether the same was "valid" or even a "debt," although he had been voluntarily paying FMCC $50 a month on the judgment both before and after the submission of the Credit Application for Loan # 1 and Loan # 2. In his 2015, 2016 and 2024 bankruptcies Bradley listed the "debts" to both the OTC and FMCC as "non-contingent, liquidated and not disputed."

A debtor's mere "unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts." *Liming*, 797 F.2d at 897(quoting 3 *Collier on Bankruptcy* ¶ 523.09 [5][b], at 523-62 (15th ed. 1981)); *In re Robertson*, 570 B.R. 352, 362-

---

[10] Bradley testified that he never made an Offer and Compromise to the OTC. [Tr. pg. 61].

19

63 (Bankr. D. Utah 2017). The Court finds Bradley's stated reasons for not listing the FMCC and OTC debts, particularly in light of his mortgage lending background, neither plausible nor credible.

### B. Debtor Jennifer Rund

Jennifer did not sign the Promissory Note for Loan # 1, and there was no evidence presented that she participated in the preparation of the Credit Application of January 12, 2022, submitted only in the name of Bradley.  Jennifer and Bradley did sign the Mortgage as Members and Managers of the Limited Liability Company which owned the property upon which their home was to be built, but the Bank does not claim that there was any misrepresentation of the Debtors' financial condition contained in the Mortgage. The TransUnion Credit Report obtained by the Bank in conjunction with a Loan # 1 and relied upon by the Bank was only in the name of Bradley.

Jennifer's testimony, such that it was,[11] disclaimed any recollection or knowledge of any of the facts surrounding her and Bradley's execution of the 2023 Credit Application [Bank Ex. 10] or Bradley's execution of his Credit Application in January 2022.

Jennifer had answered one of the Bank's Interrogatories as to whether she was aware of the OTC debt at the time that she signed the Credit Application for Loan # 2 on January 23, 2023. She responded to the Interrogatory: "Yes. It was my understanding that the tax debt had been paid. I did not handle our taxes." [Tr. pg. 116]. At trial she testified that she wasn't sure, or  didn't recall, why she had responded to the Interrogatory in that fashion. She testified that she couldn't recall or was not sure as to why she thought the tax

---

[11] In 12  pages of trial testimony, Jennifer answered "I don't know" or "I'm not sure" 23 times.

had been paid. [Tr. pg. 116].

Another Interrogatory of the Bank inquired as to whether she was aware of the FMCC judgment at the time she signed the January 18, 2023, Credit Application and, if so, why she failed to disclose it. She had responded to the Interrogatory: "Yes. This debt was not in my name and it was my understanding that my husband had this debt worked out." [Tr. Pg. 114]. At trial she testified that she couldn't recall or didn't know, why she had responded to the Interrogatory in that fashion. She testified that she wasn't sure or didn't recall if the FMCC judgment had been taken care of or was still owed by Bradley at the time she filed for bankruptcy in November 2024. [Tr. pg. 115].

These minor inconsistencies in Jennifer's testimony are not significant for two reasons. First, the Court believes her testimony that she really did not have any knowledge of the status of either the FMCC or the OTC debts other than what she might have been told by Bradley. Second, and more importantly, the Court does not believe that any information contained in the Credit Application which Jennifer signed with regard to Loan # 2 was material to the Bank in advancing the loan proceeds, and the Bank did not reasonably rely upon the 2023 Credit Application.

### C. The Extension of Credit Under Loan # 2.

The circumstances of Loan # 2 were very different from Loan # 1. Loan # 2 was made because the one year maturity date of Loan # 1 was coming due, the construction of the Debtors' new home was incomplete, the cost of the project had overrun the budget, the Debtors had fired the original contractor, the Debtor's had let insurance on the house lapse so that the Bank had "force-placed" the insurance, and an additional $79,000 was required to complete the project. [Tr. pgs. 144-45 & 149]. The Bank was compelled to

21

make Loan # 2 to see that the project was completed after it already put over $400,000 into it. The Bank had to make Loan # 2 to protect its investment. The fact that Loan # 2 was made to save the Bank's investment is evidenced by the testimony of Bank Senior VP McPherson who testified that Loan # 2 not only included $72,000 in new funds needed to complete the house but an additional $100,000 which the Bank applied to Loan # 1 which it had modified on November 3, 2022, to a principal of $510,000 with a one-year extension with a new maturity date of March 2024.[12] Not only did the Bank restructure Loan # 1 to make it performing, it raised the interest rate on modified Loan # 1 from 5.372% to 8.4%. The Bank placed an interest rate on Loan # 2 at 19.133% because, as testified to by McPherson, "with the second loan...we were over, over, overboard quite a bit." [Tr. pg. 144].

The fact that the Bank made Loan # 2 without relying upon the the Debtors' Credit Application of January 18, 2023, given in conjunction with Loan # 2, is further evidenced by the fact that the Factual Data credit report obtained by the Bank on December 27, 2022, [Bank Ex. 24] showed that the Debtors' FICO credit scores had "considerably" deteriorated from the time of Loan # 1, showing "serious delinquency" on the Debtors' part, and yet the Bank proceeded to make Loan # 2.

The Credit Application of January 2023 which Jennifer signed as the Co-Applicant does not contain any meaningful financial information concerning her, i.e. her current

---

[12]  The evidence was not clear as to the amount of funds advanced for completion of the house. Both the Bank representatives and Bradley testified that $79,000 of the proceeds from Loan # 2 was for completion of the construction. [Tr. pgs. 143-44, 98-99 & 101]. The Promissory Note for Loan # 2 would indicate that funds advanced for completion of the house was approximately $72,000 and $100,000 to be applied on Loan # 1.

employer is shown as "Self-Employed-Vintage Designs" with income of $0.00. The financial information contained in Bradley's section of the Credit Application shows his salary/wages of $108,036.40, with a gross income of $135,045.50. The information concerning "Deposit" and "Debts" both show $0.00 balances. The credit report obtained from Factual Data for Loan #2 contained many red flags, including poor FICO credit scores and "serious delinquencies;" nevertheless, the Bank went ahead and made the loan.

The Court also notes that the Change in Terms Agreement by which the Bank unilaterally increased the principal on Loan # 1 by $100,000 to $510,000 is dated November 3, 2022. The Credit Application submitted by Bradley and Jennifer for Loan # 2 is dated January 18, 2023. Thus, it appears that the Bank had already begun to restructure the Debtors' obligation to best meet the Bank's needs by making Loan # 2 for sufficient funds to allow for completion of the house and to apply $100,000 to Loan # 1 which obviously was not going to be paid by its original maturity date. As McPherson testified, the $100,000 component of Loan # 2 "was to make that (Loan # 1) whole" and "to fit the (Bank's) policy." [Tr. pg. 145].

Tyson testified that the Bank would not have made Loan # 2 if it had known about either the FMCC judgment or the OTC debt. [Tr. pg. 167]. The evidence doesn't support that. Reliance on Bradley's Credit Application appears be true regarding Loan # 1, but it also appears that regardless of the Debtors' poor credit the Bank would have made Loan # 2 to protect the $400,000 it had already invested in the project. The Bank had already made its decision to make Loan # 2 and the Credit Application for Loan # 2 was perfunctory. In short, Loan # 2 was made in the Bank's interest as well as the Debtors. The Court does not believe that minimal information contained in the Credit Application of

23

January 18, 2023, was either material nor relied upon by the Bank in making its decision to make Loan # 2.

The Court has found that with regard to Bradley's obligation under Loan # 1, the Bank has met its burden of proof with regard to the elements for non-dischargeability under § 523(a)(2)(B). Is Bradley's debt to the Bank for Loan # 2 non-dischargeable even if the Bank did not rely upon his Credit Application given in conjunction with that loan? In other words, the question is whether a subsequent loan between the parties should be determined non-dischargeable if the earlier loan was held non-dischargeable due to a false financial statement.

A subsequent related loan is not automatically deemed non-dischargeable under § 523(a)(2)(B) merely because an earlier loan was determined to be nondischargeable due to a false financial statement. *In re Allen*, 65 B.R. 752, 765 ( E.D. Va. 1986) *rev'd on other other grounds*, 823 F.2d 548 (Table), 1987 WL 36727 (4th Cir. 1987). For a subsequent loan to be non-dischargeable, the creditor must prove the elements required by the statute, i.e. that the debtor provided a materially false financial statement, that the creditor reasonably relied on the statement, and that the debtor intended to deceive the creditor. *Id.*; *In re Archangeli*, 6 B.R. 50 (Bankr. D. Me. 1980). The rationale for such decisions is that the non-dischargeable amount is limited to the amount of credit actually extended in reliance on the false financial statement. *Allen*, 65 BR at 765. The legislative history to the Bankruptcy Reform Act of 1978 is consistent with which such holdings:

> *** If an initial loan is made subject to a false financial statement and new money is advanced under a subsequent loan that is not made under conditions of fraud or false pretenses, then only the initial amount of the loan made on the

> original financial statement is invalidated and excepted from
> discharge. On the other hand, where the original financial
> statement is made under nonfraudulent conditions and the
> entire loan in addition to new money is advanced under a
> subsequent false financial statement, the entire loan is made
> under fraudulent conditions. This rule is sound as a matter of
> policy because the creditor relies to his detriment with respect
> to the entire amount advanced under the false financial
> statement. ***

H.R. Rep. No. 595, 95th Cong., 2d Sess. 130–32, reprinted in 1978 U.S. Code Cong. & Ad. News 6091–92 (footnote omitted); *see also* Resnick and Sommer, 4 *Collier on Bankruptcy* ¶ 523.08[2][f] (16th Ed. 2015) (stating same rule). Here, Loan # 2 was not a renewal or consolidation of Loan # 1 but, as described by McPherson, "a different type of loan." [Tr. pg. 136]. The Court finds the Bank has not established the required elements of § 523(a)(2)(B) as to Loan # 2.

## V. Conclusion

The Court finds that the Credit Application dated January 18, 2022, which Debtor/Defendant Bradley Rund provided Legacy Bank was a materially false financial statement upon which the Bank reasonably relied in making the loan represented by the Promissory Note dated March 9, 2022 (Loan # 1). Accordingly, Bradley's obligation thereunder is hereby determined **Non-Dischargeable** under the provisions of 11 U.S.C. § 523(a)(2)(B).

As to both Defendants, Bradley Rund and Jennifer Rund, the Court finds that Legacy Bank has not met its burden of proof to establish under § 523(a)(2)(B) that Bradley and Jennifer with fraudulent intent gave a materially false financial statement upon which the Bank reasonably relied in making the loan under the Promissory Note dated January

25

23, 2023 in the principal amount of $172,547.57 (Loan # 2). The Court therefore determines that Bradley Rund and Jennifer Rund's liability to Legacy Bank with respect to Loan # 2 is hereby **Discharged.**

In the *Final Pretrial Order* the parties stipulated that at the time of the filing of bankruptcy the balance due upon Loan # 1 was $470,858.23 and upon Loan # 2 was $226,545.23, for total amount of $692,139.38; however, the Court takes judicial notice that the property securing the debt was foreclosed in state court proceedings, and Legacy Bank purchased the property at sheriff's sale with a credit bid of $287,000, which sale was confirmed by the District Court of Blaine County, State of Oklahoma on February 24, 2025.[13]

The Court is withholding entry of a monetary amount to be determined non-dischargeable pending confirmation by the parties as to an agreed amount of the judgment or, in the absence of an agreement, setting the matter for an for an evidentiary hearing to establish the amount of the non-dischargeable judgment.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, a separate judgment as to Bradley Rund and Jennifer Rund will be entered contemporaneously with the entry of this Opinion and Order.

# # #

---

[13] *Legacy Bank, an Oklahoma state banking corporation, Plaintiff v. Bradley Everett Rund, an individual, et al., Defendants,* Case No. CJ-2024-11, District Court of Blaine County, State of Oklahoma. This Court is entitled to take judicial notice of both its own docket sheets and state court docket sheets. *United States v. Ahidley,* 486 F.3d 1184, 1192, n. 5 (10th Cir. 2007) ("We may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters which bear directly upon the disposition of the case at hand."); *Adams v. Watts,* 2009 WL 5101759 (W.D. OK. 2009) (taking judicial notice of the public records of the District Court of Comanche County available on the Internet); *Shoulders v. Dinwiddie,* 2006 WL 2792671 (W.D. OK. 2006) (court may take judicial notice of state court records available on the world wide web including docket sheets in district courts).